UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

JAMES CHRISTOPHER KING,

                Plaintiff,

v.

ROCKLAND COUNTY SHERIFF LOUIS
FALCO III; DR. SHINDER; DR. PIACENTE;
NURSE G. GERMAIN; NURSE J. THOMAS;
NURSE J. LOVELIN; DR. ZACHARIAH;
NURSE J. MARIAMMA; NURSE NIANA;
NURSE R. STEPHEN; NURSE ADMIN. J.
PETRANKER; NURSE WILDA-STANFORT;
NURSE V. NAYAUDUPALLI; NURSE S.
SHADI; NURSE PHILIPN; NURSE L.
THOMAS; S. DANIEL; N.P. E. HANDLER;
NURSE ANIM; NURSE R. PILLAI; NURSE P.
ANGOL; NURSE J. BAJWA; NURSE E.
MAHABIR; NURSE N. PRINJA; NURSE M.
SCHIAVONE; NURSE SKOROLOHORSE;
NURSE MARCIA ANDERSON; NURSE
RICHARDS; NURSE D. TAYLOR; N.P.
GEORGE; NURSE L. POULOUSE; NURSE
PHILSON; and NURSE SKARIAH,

                Defendants.

**OPINION AND ORDER**

16 CV 6315 (VB)

---------------------------------------------------------------x

Briccetti, J.:

       Plaintiff James Christopher King, proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983, alleging defendants were deliberately indifferent to plaintiff's serious medical needs in violation of his Fourteenth Amendment rights.[1] Plaintiff names thirty-one defendants who worked at the Rockland County Correctional Facility (the "Jail") during plaintiff's incarceration: Nurse Philip; Nurse J. Thomas; Nurse Lovelin; Nurse M. Jacob; Nurse

---

[1] Plaintiff claims defendants violated his Eighth Amendment rights, but as discussed below, the Court applies the Fourteenth Amendment here.

Administrator Petranker; Nurse Nayaudupalli; Nurse Shaji; Nurse L. Thomas; Nurse Pillai; Nurse Bajwa; Nurse Schiavone; Nurse Anderson; Nurse Skariah; Louis Falco III; Dr. Shinder; Nurse Germain; Dr. Zachariah; Nurse Ninan; Nurse Stephen; Nurse Wilda-Stinfort; Nurse Daniel; Nurse Anim; Nurse Mahabir; Nurse Sokorolohorsky; Nurse Richards; and Nurse Poulouse (collectively, the "County Defendants"); Dr. Piacente; Nurse Practitioner ("N.P.") Handler; and N.P. George (collectively, the "Contractor Defendants"); and Nurse Prinja and Nurse Angol.[2]

Now pending are five motions to dismiss the second amended complaint ("SAC") pursuant to Rule 12(b)(6) filed by the Contractor Defendants and County Defendants:

1. March 1, 2018, Contractor Defendants' motion on behalf of Handler and Piacente (Doc. #83);

2. March 1, 2018, County Defendants' motion on behalf of Falco, Anderson, Skariah, Schiavone, Bajwa, Lissama Thomas, Lovelin, Nayaudupalli, Shaji, Petranker, Pillai, Jacob, and Jessy Thomas (Doc. #85);

3. April 16, 2018, County Defendant Philip's motion (Doc. #134);

4. April 20, 2018, Contractor Defendant George's motion (Doc. #139); and

---

[2] Nurse Philip was sued incorrectly as "Nurse Philipn"; Nurse M. Jacob was sued incorrectly as "Nurse J. Mariamma"; Nurse S. Shaji was sued incorrectly as "Nurse S. Shadi"; Nurse Ninan was sued incorrectly as "Nurse Niana"; Nurse Wilda-Stinfort was sued incorrectly as "Nurse Wilda-Stanfort"; and Nurse Sokolohorsky was sued incorrectly as "Nurse Skorolohorse." Furthermore, "Nurse Richards" and "Nurse Taylor" are the same person, herein Nurse Richards; and "Nurse Angol" and "Nurse Philson" are the same person, herein Nurse Angol.

5. July 17, 2018, County Defendants' motion on behalf of Daniel, Germain, Mahabir, Stephen, Sokolohorsky, Ninan, Richards, Anim, Poulouse, Wilda-Stinfort, Zachariah, and Shinder (Doc. #175).

Defendants Nurses Prinja and Angol were never served with process.

For the reasons set forth below, defendants' motions are GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

In deciding the pending motions, the Court accepts as true all well-pleaded allegations in the SAC and draws all reasonable inferences in plaintiff's favor, as set forth below.

I. <u>Plaintiff's Arrest and Incarceration</u>

On December 1, 2015, police officers from the Village of Spring Valley Police Department arrested plaintiff. During the arrest, officers allegedly punched and kicked plaintiff in the head, handcuffed him, Tasered him numerous times, and dragged him to a police car. Emergency medical services officers later transported plaintiff to Good Samaritan Hospital in Suffern, New York, where an emergency room doctor allegedly diagnosed plaintiff with a concussion, prescribed Oxycodone, and instructed plaintiff to follow up with a neurologist "as soon as possible within two days." (SAC ¶ 223).

On December 2, 2015, plaintiff arrived at the Jail and told Nurse Daniel about the alleged assault and the Good Samaritan doctor's recommendation that plaintiff follow up with a neurologist "as soon as possible." (SAC ¶ 235).

The next morning, on December 3, 2015, at 8:00 a.m., officers found plaintiff unconscious in his cell and called emergency medical staff. Dr. Zachariah and Nurses Anim and

Anderson came to plaintiff's aid, and plaintiff was rushed to Nyack Hospital. A Nyack doctor allegedly diagnosed plaintiff with a concussion and told him to follow up with a neurologist "as soon as possible" and inform the Jail's medical staff if the pain continued. (SAC ¶ 242).

II.    Plaintiff Complains of Ear Problems and Seeks Neurological Care

After plaintiff returned to the Jail, he alleges he was in "severe pain" from December 4 to December 7, 2015. (SAC ¶ 246). Despite his requests for medical attention on December 4, 2015, for "extreme pain," plaintiff alleges Nurses Wilda-Stinfort and Sokolhorsky walked by plaintiff's cell and ignored him. (SAC ¶¶ 247–48). On December 7, 2015, Dr. Zachariah saw plaintiff, and plaintiff complained about head and neck pain, hearing difficulties, ringing in the ears, and numbness in his feet and hands, and asked when he would see a neurologist. According to plaintiff, Dr. Zachariah said he would put plaintiff "on the list to see the neurologist." (SAC ¶ 253).

According to plaintiff, his pain and insomnia increased the following week, and he complained to the nurses on duty from December 7 to December 14, 2015: Nurses Angol, Ninan, Wilda-Stinfort, Richards, Anderson, Schiavone, Poulouse, and Anim. (SAC ¶¶ 255–61).

On December 13, 2015, Nurse Germain gave plaintiff a sick call request form— essentially, a request for medical attention—and plaintiff filled out the form complaining of pain. The following day, Dr. Zachariah saw plaintiff for pain, numbness in his hands and feet, and hearing difficulties, but plaintiff alleges Dr. Zachariah provided no treatment and sent plaintiff back to his cell.

On December 20, 2015, at 11:30 p.m., plaintiff alleges he woke up with extreme head and ear pain. About an hour later, officers took plaintiff to the medical department, where

plaintiff told Nurse Mahabir that he was in "extreme pain." (SAC ¶ 267). Nurse Mahabir gave plaintiff a sick call request form but provided no treatment for pain.

According to plaintiff, on December 27, 2015, he told Nurse Angol he had a severe headache and "couldn't hear out of one of his ears." (SAC ¶ 271). Two days later, plaintiff was seen by an unidentified medical staff member, and plaintiff complained of a headache and hearing difficulties. Plaintiff received Tylenol but no other treatment or examination.

On January 1, 2016, plaintiff allegedly saw Dr. Shinder and told him about the December 1, 2015, assault and the resulting "head trauma" and "problems hearing." (SAC ¶ 275). Plaintiff again received no treatment and was sent back to his cell.

On January 10, 2016, plaintiff alleges he was again in "extreme pain," and Nurse Germain gave plaintiff a sick call request form. (SAC ¶¶ 280–81). On the form, plaintiff noted "his ear was hurting really bad" despite taking aspirin and that he was supposed to see a neurologist for his head injury. (SAC ¶ 282).

The next day, Dr. Shinder examined plaintiff in the presence of Nurse Administrator Petranker. According to plaintiff, although Petranker told him "there [was] no need to see a neurologist," Dr. Shinder said he should see a specialist. (SAC ¶¶ 285–86).

On January 13, 2016, plaintiff alleges he was seen by an unidentified nurse for a severe headache and ear pain but received no treatment. The next day, on January 14, 2016, plaintiff lost consciousness in his cell. Plaintiff alleges he was in severe pain and had numbness in his hands and feet. According to plaintiff, Nurse Prinja, Dr. Shinder, and a non-party sergeant were called to plaintiff's cell, and the sergeant kicked plaintiff in his side.

III.    <u>Plaintiff Receives Neurological Care for Head Trauma</u>

On January 25, 2016, plaintiff saw two neurologists at Westchester Medical Center who allegedly diagnosed him with nerve damage and a concussion, prescribed him medication for pain and sleep problems, and scheduled him for an MRI.  Plaintiff also alleges he complained about hearing loss to the neurologists, but one neurologist told plaintiff to address those problems with the Jail's medical personnel, because as a neurologist, he only handled head and neck complaints. The neurologists prescribed medication for insomnia and pain and scheduled an MRI.

Plaintiff returned to the Jail. In the following weeks, plaintiff alleges medical personnel ignored his sick call request forms because he was scheduled for a neurology follow-up appointment and an MRI.  Plaintiff alleges he submitted a February 14, 2016, request form to Nurse Prinja for head and back pain; a February 16 request form to Nurse Bajwa for extreme pain; a February 29 request form to an unnamed staff member for chronic pain; and a March 11 request form to Nurse L. Thomas for headaches.

Plaintiff alleges he was seen by medical staff during this time, but they declined to provide him treatment:  N.P. George denied treatment on February 18 and February 29, 2016, and N.P. Handler denied treatment on March 17, 2016.

On March 18, 2016, plaintiff received an MRI at Westchester Medical Center. According to the SAC, the MRI showed no fractures.

Plaintiff alleges his pain persisted, and from March 27 to April 4, 2016, the nurses who dispensed medication "deliberately avoided" him:  Nurses L. Thomas, Nayaudupalli, Prinja, Jacobs, Lovelin, Stephen, Bajwa, J. Thomas, and Pillai.  (SAC ¶¶ 331–37).  On April 5, 2016,

N.P. Handler saw plaintiff for chronic pain but provided no treatment because N.P. Handler allegedly claimed plaintiff had an upcoming neurology appointment.

On or around April 16, 2016, plaintiff submitted a sick call request form to Nurse Philip "stating he was having problems with his hearing."  (SAC ¶ 341).  Plaintiff does not allege whether he received treatment.

On May 2, 2016, plaintiff was seen by a neurologist at Westchester Medical Center for the third time.  Plaintiff alleges the neurologist prescribed medication and told plaintiff to follow up in two to three months.  Plaintiff states he experienced "moderate" relief.  (SAC ¶ 343).

IV.     Plaintiff's Complaints Resume Until His Transfer to Downstate Correctional Facility

Plaintiff's complaints resumed on August 5, 2016, when he submitted a sick call request form to Nurse Shaji for chronic headaches and dizzy spells.  For three days, plaintiff alleges Nurses Nayaudupalli, Bajwa, Anderson, and L. Thomas "deliberately avoided him."  (SAC ¶¶ 345–47).  On August 8, 2016, Nurse Poulouse saw plaintiff and gave him Tylenol.  Later that day, plaintiff submitted another sick call request form to Nurse Shaji for a headache.  Although plaintiff does not specify when, he alleges he was seen by Dr. Piacente and N.P. Handler who noted plaintiff had "chronic heada[c]hes, no[] follow up with neurologist at this time."  (SAC ¶ 349).  According to plaintiff, Dr. Piacente and N.P. Handler provided no treatment.

Plaintiff alleges he was in extreme pain for the rest of August.  (SAC ¶ 351).

On September 6, 2016, plaintiff submitted a sick call slip to Nurse Shaji for pain and ringing in his ears.  N.P. Handler examined plaintiff the following day, diagnosed plaintiff with an ear infection, and prescribed antibiotics.  Plaintiff alleges N.P. Handler refused to send plaintiff to an audiologist because plaintiff "was costing the Jail too much money," as he was already seeing a neurologist.  (SAC ¶ 356).

On November 12, 2016, plaintiff submitted a sick call request form to Nurse A. George[3] for head pain and dizzy spells. Dr. Piacente saw plaintiff two days later but allegedly provided no treatment because he said plaintiff had an upcoming neurology appointment.

On December 2, 2016,[4] plaintiff was transferred to Downstate Correctional Facility ("Downstate"). Three days later, he saw a staff doctor at Downstate, who scheduled plaintiff for an audiology examination when plaintiff complained of hearing loss. On December 14, 2016, an audiologist conducted a hearing test and allegedly determined plaintiff had permanent hearing loss and would be "disabled for the rest of his life." (SAC ¶ 369). Plaintiff alleges he told the audiologist his hearing began to diminish after he was beaten during his arrest on December 1, 2015.

V.     The Grievance Process

Plaintiff alleges he filed two grievances concerning his medical care at the Jail.[5]

The first grievance, filed on January 12, 2016, alleged plaintiff received inadequate medical care because (i) despite doctors' recommendations, plaintiff had not seen a neurologist, and (ii) he had received no treatment for hearing loss. (See Doc. #87-1). Plaintiff alleges on January 19, 2016, after an investigation, plaintiff's grievance was denied because he was

_____

[3]     Nurse A. George is not named in the SAC's caption.

[4]     Plaintiff alleges he was transferred on December 2, 2015, but the Court assumes plaintiff means December 2, 2016. (SAC ¶ 360).

[5]     "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

scheduled to see a neurologist in the coming weeks.  Plaintiff appealed, and on January 21, 2016, the Jail's denial of plaintiff's grievance was sustained.

The second grievance, signed by plaintiff on February 20, 2016, but unsigned by a Jail staff member, alleged (i) plaintiff was in pain, (ii) plaintiff was supposed to get an MRI for his back, and (iii) plaintiff's "ear is hurting [and he] need[s] to see [an] ear doctor." (Doc. #145 at ECF 2[6]).  Plaintiff alleges he submitted this grievance to the intake officer on duty that night but never received a response.  (Id. at ECF 25).

## DISCUSSION

I.    Legal Standard

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus insufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 554, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged."

---

[6]    When noted, citations reflect page numbers assigned by the Court's Electronic Case Filing system.

Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

II.    Exhaustion of Remedies

The County Defendants and Contractor Defendants argue plaintiff's failure to exhaust administrative remedies concerning his allegedly inadequate medical care warrants dismissal.

The Court disagrees.

The Prison Litigation Reform Act of 1995 ("PLRA") provides "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

To properly exhaust, an inmate must follow all steps that the agency lays out in its grievance process.  Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011).  However, only remedies "available" to the prisoner need be exhausted.  Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016) (citing Ross v. Blake, 136 S. Ct. 1850, 1856 (2016)).  An administrative remedy is considered unavailable in "three kinds of circumstances:"  (i) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (ii) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use—i.e., some mechanism exists to provide relief, but no ordinary prisoner can navigate it"; and (iii) "when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation."  Ross v. Blake, 136 S. Ct. at 1859.

Failure to exhaust under the PLRA is an affirmative defense.  Jones v. Bock, 549 U.S. 199, 216 (2007).  A plaintiff is not required to plead exhaustion, so when "a prisoner indicates that he has taken some steps toward exhaustion, district courts will normally not infer from his silence that he failed to take the remaining steps that full exhaustion would require."  Huggins v. Schriro, 2015 WL 7345750, at *3 (S.D.N.Y. Nov. 19, 2015) (emphasis added), report and recommendation adopted, 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016).[7]  "Dismissal under Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint."  Roland v. Smith, 907 F. Supp. 2d 385, 388 (S.D.N.Y. 2012).  If "ambiguity exists as to whether a plaintiff exhausted his administrative remedies," courts generally deny motions to dismiss on this ground.  Huggins v. Schriro, 2015 WL 7345750, at *3.

---

[7]     Because plaintiff is proceeding pro se, he will be provided with copies of all unpublished opinions cited in this decision.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Here, plaintiff alleges he submitted two grievances concerning his inadequate medical care on January 12 and February 20, 2016. At the very least, "ambiguity exists" as to whether these grievances exhausted plaintiff's administrative remedies. See Huggins v. Schriro, 2015 WL 7345750, at *3. More specifically, it is unclear whether the Jail addressed all the issues raised in plaintiff's first grievance; whether plaintiff's second grievance was properly filed; whether the Jail's handbook set forth procedures concerning a grievance to which no prison official responds; and whether the Jail's grievance process was available to plaintiff.

Accordingly, absent a more complete record, the Court cannot conclude as a matter of law that plaintiff failed to exhaust his administrative remedies.

III.  Personal Involvement

The County Defendants argue plaintiff fails plausibly to allege the personal involvement of Falco and Skariah.

The Court agrees.

To state a Section 1983 claim, plaintiff must allege defendants' personal involvement in an alleged deprivation of plaintiff's constitutional rights. See Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013). In other words, plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.

A defendant may not be held liable under Section 1983 solely because that defendant employs or supervises someone who violated the plaintiff's rights. Ashcroft v. Iqbal, 556 U.S. at 676. However, in this Circuit, a supervisor's personal involvement may be established by showing:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

As to Falco, plaintiff fails to allege Falco was involved in a personal or supervisory capacity in the alleged constitutional violation. Plaintiff makes no allegations Falco knew of, participated in, or failed to act in the face of other defendants' alleged deliberate indifference to plaintiff's serious medical needs, or that Falco negligently supervised Jail staff. See Colon v. Coughlin, 58 F.3d at 873. Plaintiff's sole allegation that "[a]s a matter of de facto policy," the Jail "tolerates" Eighth Amendment violations (see SAC ¶¶ 394–95) fails to allege facts suggesting Falco created, continued, or countenanced a policy or custom that caused a constitutional violation to occur.

As to Nurse Skariah, plaintiff includes Nurse Skariah's name in the case caption but fails to make any substantive allegations against her in the body of the complaint.

Accordingly, all claims against Falco and Skariah must be dismissed for plaintiff's failure to plead their personal involvement.

IV.    Deliberate Indifference Under the Fourteenth Amendment

Because plaintiff was initially a pretrial detainee,[8] his claim for deliberate indifference is analyzed under the Due Process Clause of the Fourteenth Amendment, rather than under the

_____

[8]    Plaintiff was initially a pre-trial detainee. During that time, his right to adequate medical care arose under the Fourteenth Amendment. At some point during his incarceration at the Jail, he became a post-conviction detainee, and his right to adequate medical care arose under the Eighth Amendment. (See Doc. #88 at 10 n.5.) Because it is not clear when plaintiff's detention status changed, the Court will apply the less stringent Fourteenth Amendment standard.

Eighth Amendment, because "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)).  To state a deliberate indifference claim under the Fourteenth Amendment, plaintiff's allegations must satisfy two prongs:  an objective prong and a mens rea prong.  Each is discussed in turn.

      A.    Objective Prong

To satisfy the objective prong, plaintiff must plausibly allege "the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." Darnell v. Pineiro, 849 F.3d at 29.  This occurs when "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to [plaintiff's] health." Id. at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)).  "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

"Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006).  "The first inquiry is whether the prisoner was actually deprived of adequate medical care." Id.  Because "the prison official's duty is only to provide reasonable care," prison officials are liable only if they fail "'to take reasonable measures' in response to a medical condition." Id. at 279–80 (quoting Farmer v. Brennan, 511 U.S. 825, 827 (1994)).  The second inquiry is "whether the inadequacy in medical care is sufficiently serious." Id. at 280.  "This inquiry requires the court to examine how the

offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. (citation omitted).

If the offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin v. Goord, 467 F.3d at 280. If the offending conduct is "the medical treatment given," however, "the seriousness inquiry is narrower." Id. Courts look to "the alleged inadequate treatment, not the underlying condition alone," and consider "the effectiveness of the treatment the prisoner received, and the harm that resulted from the alleged shortfalls." Sanders v. City of New York, 2018 WL 3117508, at *8 (S.D.N.Y. June 25, 2018). However, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to" a constitutional violation. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

Here, plaintiff claims he was deprived of adequate treatment for two sufficiently serious conditions—his head trauma and hearing loss. For the following reasons, plaintiff fails to allege facts suggesting he "was actually deprived of adequate medical care" for his head trauma. However, he plausibly alleges he was deprived of treatment for his hearing loss and that the inadequacy was sufficiently serious. See Salahuddin v. Goord, 467 F.3d at 279–80.

i.     Head Trauma

Plaintiff alleges he was seen by Jail medical staff members for his complaints of head and neck pain sixteen times from December 2, 2015, to November 14, 2016. Plaintiff admits he saw specialists outside the Jail three times within six months of his head trauma, and that during one of those visits, he received an MRI, which he says showed no fractures. Plaintiff does not allege

how the treatment he received for his head trauma was inadequate. His belief that he should have received different or additional medical treatment for his injuries is not a sufficient basis for a deliberate indifference claim. Chance v. Armstrong, 143 F.3d at 703.

Furthermore, to the extent plaintiff claims defendants unconstitutionally delayed his examination by a specialist for his head trauma, "[t]he Second Circuit has generally found constitutional violations with respect to delays in providing medical care only when the 'officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.'" Valdiviezo v. City of New York, 2017 WL 1191528, at *4 (S.D.N.Y. Mar. 29, 2017) (quoting Demata v. N.Y. State Corr. Dep't of Health Servs., 198 F.3d 233 (2d Cir. 1999) (internal quotation omitted)). Plaintiff concedes he saw a neurologist on January 25, 2016, within two months of his December 2, 2015, incarceration at the Jail, and received an MRI on March 18, 2016. Plaintiff does not allege the delay was a form of punishment or that his head trauma was life-threatening or fast-degenerating. Thus, the alleged delay does not rise to the level of a constitutional violation.

ii.     Hearing Loss

Plaintiff alleges he complained about hearing loss or ear pain ten times to various Jail medical staff members: on December 7, 2015 (hearing loss and ringing in the ears, SAC ¶¶ 249–51); December 14, 2015 (hearing loss, SAC ¶¶ 263–64); December 20, 2015 (ear pain, SAC ¶ 265); December 27, 2015 (hearing loss, SAC ¶ 271); December 29, 2015 (hearing loss, SAC ¶ 272); January 1, 2016 (hearing loss, SAC ¶ 275); January 10, 2016 (ear pain, SAC ¶ 282); January 13, 2016 (ear pain, SAC ¶¶ 285–86); April 16, 2016 (hearing loss, SAC ¶ 341); and September 6, 2016 (ringing in the ears, SAC ¶¶ 285–86). Plaintiff also alleges he filed two

grievances concerning, among other things, his hearing loss on January 12 and February 20, 2016, and he complained to a neurologist from Westchester County Medical Center on January 25, 2016.  According to plaintiff, the only treatment he received for his ears occurred on September 7, 2016—ten months after his first complaint—for an ear infection.

Turning then to the seriousness of plaintiff's alleged medical condition, courts have found the ability to hear is "a basic human need affecting daily activity and sufficiently serious to warrant treatment by physicians."  See Rennalls v. Alfredo, 2015 WL 5730332, at *11 (S.D.N.Y. Sept. 30, 2015) (quoting Rosales v. Fischer, 2009 WL 928260, at *12 (S.D.N.Y. Mar. 31, 2009)).  Indeed, three months later, an audiologist allegedly discovered plaintiff suffered from permanent hearing loss.

Plaintiff therefore plausibly alleges he received no treatment, or at most, inadequate treatment, for this "sufficiently serious" condition.  Salahuddin v. Goord, 467 F.3d at 280.  Accordingly, plaintiff has pleaded facts to satisfy the objective prong for his claim of deliberate indifference as to his hearing loss but not as to his head trauma.

B.    Mens Rea Prong

To satisfy the mens rea prong, a "pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  Darnell v. Pineiro, 849 F.3d at 35 (emphasis added).  Thus, unlike the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."  Id.

"[D]istinguishing between negligent and reckless medical care is a difficult task, especially at the motion-to-dismiss stage where courts lack the benefit of expert opinion." Man Zhang v. City of New York, 2018 WL 3187343, at *8 (S.D.N.Y. June 28, 2018) (quoting Richardson v. Corr. Med. Care, Inc., 2018 WL 1580316, at *6 (N.D.N.Y. Mar. 28, 2018)). Courts often look to the "degree of risk associated with the negligent treatment," id. (quotation omitted), and have found the mens rea prong satisfied when a plaintiff did not receive treatment for a documented condition or complaint. See Smith v. Outlaw, 2017 WL 4417699, at *4 (S.D.N.Y. Sept. 30, 2017) (finding mens rea prong satisfied when physician's assistant took no action in response to complaints from plaintiff with pre-existing heart condition); Richardson v. Corr. Med. Care, Inc., 2018 WL 1580316, at *6 (finding mens rea prong satisfied when medical officer failed to provide treatment or referral to a cardiologist despite plaintiff's history of heart issues).

Because plaintiff adequately pleads the objective prong as to his hearing loss only, the Court's remaining inquiry is whether plaintiff plausibly alleges defendants had the requisite mens rea for plaintiff's claim of deliberate indifference as to his hearing loss. For the following reasons, plaintiff has satisfied the mens rea prong only as to Dr. Zachariah, Dr. Shinder, Nurse Administrator Petranker, and N.P. Handler. Plaintiff adequately alleges these defendants knew or should have known of the risk of excessive harm plaintiff faced from his ear pain and hearing loss, and these defendants failed to act to mitigate the risk.

i.     Dr. Zachariah

Plaintiff alleges Dr. Zachariah responded when plaintiff lost consciousness in his cell on December 3, 2015, and was transported to Nyack Hospital. According to plaintiff, Dr. Zachariah also examined plaintiff on December 7, 2015, and plaintiff told Dr. Zachariah about severe pain

in plaintiff's neck and head, ringing in his ears, and numbness in his hands and feet. Dr. Zachariah allegedly noted the doctors at Good Samaritan and Nyack Hospitals recommended plaintiff see a neurologist, and Dr. Zachariah said he would put plaintiff on "the list to see the neurologist." (SAC ¶ 253). Plaintiff alleges he returned to Dr. Zachariah a week later with complaints of pain, hearing loss, and numbness. Therefore, assuming the truth of these allegations as the Court must at this early stage of the case, Dr. Zachariah was aware of plaintiff's complaints of ear pain and hearing loss on December 7 and December 14, 2015, and his recent hospitalizations, and yet, he provided no treatment, further examination, or referral for plaintiff's hearing loss.

      ii.      <u>Dr. Shinder</u>

Plaintiff alleges he saw Dr. Shinder on January 1, 2016, after plaintiff complained about his head injuries and hearing loss. Plaintiff further complained of ear pain on January 10, 2016, and Dr. Shinder, along with Nurse Administrator Petranker, saw him the following day. According to plaintiff, Dr. Shinder also recommended plaintiff see a specialist for his head trauma. Therefore, Dr. Shinder was allegedly aware of plaintiff's ear pain and hearing loss but provided no treatment, further examination, or referral for plaintiff's hearing loss.

      iii.      <u>Nurse Administrator Petranker</u>

Plaintiff alleges he complained of ear pain that had lasted more than a month despite taking pain medication, and the next day, on January 11, 2016, he saw Nurse Administrator Petranker and Dr. Shinder. Nurse Administrator Petranker was allegedly aware of plaintiff's ear pain and hearing loss but provided no treatment, further examination, or referral for plaintiff's hearing loss.

iv.      N.P. Handler

Although plaintiff alleges he saw N.P. Handler on March 17, April 5, and August 9, 2016, plaintiff alleges he complained only of a headache, chronic pain, and chronic headaches, respectively.  On September 7, 2016, however, plaintiff alleges he told N.P. Handler he was suffering from ear pain and hearing loss.  While N.P. Handler diagnosed plaintiff with an ear infection and provided antibiotics, N.P. Handler provided no further treatment or examination for plaintiff's ears.  Furthermore, plaintiff specifically alleges N.P. Handler refused to send plaintiff to an audiologist because he was costing the Jail too much money.  Viewing these facts in the light most favorable to plaintiff as the Court must at this stage of the case, plaintiff alleges N.P. Handler knew or should have known plaintiff faced a serious risk of harm but took no action.

v.      Remaining Defendants

Plaintiff fails to allege facts to suggest the remaining defendants had the requisite mens rea for plaintiff's claim of deliberate indifference as to his hearing loss.  The SAC's deficiencies can be grouped into three categories:  (i) failure to allege defendants knew or should have known of plaintiff's hearing loss; (ii) failure to allege defendants knew or should have known of the substantial risk of harm plaintiff faced from his condition; and (iii) failure to allege defendants failed to act to mitigate the risk plaintiff faced.

First, plaintiff fails to allege certain defendants knew or should have known about his hearing loss.  After January 13, 2016, plaintiff alleges he only notified Jail medical staff twice about his hearing problems: on April 16 and September 6, 2016.  While plaintiff alleges he complained of pain throughout 2016, this general allegation is not enough to transform possibly negligent medical care into plausibly reckless medical care.   Therefore, despite plaintiff's repeated complaints concerning ear pain and hearing loss in December 2015 and January 2016,

plaintiff alleges no facts to suggest defendants who interacted with him after January 2016 should have known that plaintiff's ear pain or hearing loss continued to plague him.

Accordingly, plaintiff's claims must be dismissed against N.P. George (alleged interactions on February 18 and February 29, 2016); Dr. Piacente (alleged interactions on August 9 and November 14, 2016); Nurse Stephen (alleged interactions from March 27 to April 4, 2016); Nurse Lovelin (alleged interactions from March 27 to April 4, 2016); Nurse Jacobs (alleged interactions from March 27 to April 4, 2016); Nurse Pillai (alleged interactions from March 27 to April 4, 2016); Nurse J. Thomas (alleged interactions from March 27 to April 4, 2016); Nurse Pillai (alleged interactions from March 27 to April 4, 2016); Nurse Nayaudupalli (alleged interactions from March 27 to April 4 and August 6 and 7, 2016); Nurse L. Thomas (alleged interactions on March 11, from March 27 to April 4, and August 6 and 7, 2016); Nurse Bajwa (alleged interactions on February 16, from March 27 to April 4, and August 6 and 7, 2016); and Nurse A. George (alleged interaction on November 12, 2016).

Second, plaintiff fails to allege other defendants knew or should have known about the substantial risk of harm from his hearing loss. While these defendants allegedly interacted with plaintiff during the period in which plaintiff complained about ear pain to other defendants, plaintiff does not allege he made any ear-related complaints to these defendants. Even if the Court charges these defendants with constructive knowledge of plaintiff's hearing loss, plaintiff alleges no facts to suggest these defendants knew or should have known plaintiff's risk of harm was substantial. While plaintiff alleges these defendants were on duty when plaintiff complained about his head trauma or these defendants provided or received sick call request forms regarding his head trauma, this alleged conduct is not enough to evince recklessness to plaintiff's hearing loss.

Accordingly, plaintiff's claims must be dismissed against Nurse Daniel (conducted intake on December 2, 2015); Nurse Sokolohorse (on duty on December 4, 2015); Nurse Prinja[9] (came to aid on January 14 for head trauma; received sick call request form on February 14, and alleged interaction from March 27 to April 4, 2016); Nurse Mahabir (provided sick call request form on December 20, 2015); Nurse Germain (provided sick call request form on December 20, 2015); Nurse Ninan (on duty from December 7 to December 14, 2015); Nurse Richards (on duty from December 7 to December 14, 2015); Nurse Schiavone (on duty from December 7 to December 14, 2015); Nurse Wilda-Stinfort (on duty on December 4 and from December 7 to December 14, 2015); Nurse Anderson (came to aid on December 3 and on duty from December 7 to December 14, 2015); Nurse Anim (came to aid on December 3 and on duty from December 7 to December 14, 2015); and Nurse Poulouse (on duty from December 7 to December 14, 2015, and provided Tylenol on August 8, 2016).

Finally, plaintiff fails to allege Nurse Angol,[10] Nurse Philip, or Nurse Shaji did not act to mitigate the risk plaintiff faced from his hearing loss. The Court addresses these sequentially.

---

[9] Nurse Prinja was never served with process. While in an Order dated April 3, 2018, the Court directed the U.S. Marshal's Office to effect service on Nurse Prinja (Doc. #130), it is plaintiff's responsibility to ensure service is made within ninety days and, if necessary, to request an extension of time for service. See Meilleur v. Strong, 682 F.3d 56, 63 (2d Cir. 2012). The summons was returned unexecuted on May 31, 2018. (Doc. #156). On July 19, 2018, the Court reminded plaintiff that Nurse Prinja had not been served. (Doc. #183). At plaintiff's request, the Court granted plaintiff an extension to serve Nurse Prinja until November 26, 2018. (Doc. #186). To date, Nurse Prinja has not been served. Accordingly, plaintiff's claims against Nurse Prinja must be dismissed. Importantly, however, plaintiff's claims against Nurse Prinja are substantially similar to many of the other defendants who were served in this case, and the Court dismisses the claims against Nurse Prinja on the merits as well.

[10] Nurse Angol was never served with process. While in an Order dated July 17, 2018, the Court directed the U.S. Marshal's Office to effect service on Nurse Angol (Doc. #180), it is plaintiff's responsibility to ensure service is made within ninety days and, if necessary, to request an extension of time for service. See Meilleur v. Strong, 682 F.3d 56, 63 (2d Cir. 2012). The summons was returned unexecuted on September 24, 2018 (Doc. # 188). Plaintiff's time to

Plaintiff alleges Nurse Angol was on duty from December 7 to December 14, 2015, when plaintiff complained "to every nurse working in the intake unit" about his pain. (SAC ¶¶ 255–61). Plaintiff alleges he also told Nurse Angol about his hearing loss on December 27, 2015, when Nurse Angol was handing out medication. Two days later, plaintiff alleges he was seen by an unidentified staff member to whom plaintiff again complained of hearing loss. Plaintiff does not allege Nurse Angol failed to act, and indeed, alleges that two days after he complained to Nurse Angol, he discussed his hearing loss with another medical staff member.

Plaintiff's sole allegation against Nurse Philip is that on or around April 16, 2016, Nurse Philip "took" a sick call request form in which plaintiff noted he "was having problems with his hearing." (SAC ¶ 341). Plaintiff does not allege he did not to receive treatment on that occasion or even that Nurse Philip had a duty to act upon receipt of the sick call request form.

Plaintiff alleges Nurse Shaji received two sick call request forms—one unrelated to ear problems on August 8, 2016, and the other for pain and ringing in the ears on September 6, 2016. As to plaintiff's ear-related complaint, plaintiff does not allege Nurse Shaji failed to act, and indeed, alleges the following day, he was seen by N.P. Handler.

Accordingly, plaintiff's claims must be dismissed against Nurse Shaji, Nurse Angol, and Nurse Philip.

V.    Leave to Amend

Rule 15(a)(2) instructs courts "should freely give leave" to amend a complaint "when justice so requires." Liberal application of Rule 15(a) is warranted with respect to pro se

---

serve Nurse Angol or request an extension expired on October 16, 2018. Accordingly, plaintiff's claims against Nurse Prinja must be dismissed. Importantly, however, plaintiff's claims against Nurse Angol are substantially similar to many of the other defendants who were served in this case, and the Court dismisses the claims against Nurse Angol on the merits as well.

litigants who "should be afforded every reasonable opportunity to demonstrate that [they have] a valid claim." Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000). However, leave to amend may "properly be denied for . . . futility of amendment." Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). This is true even when the plaintiff is proceeding pro se. See Martin v. Dickson, 100 F. App'x 14, 16 (2d Cir. 2004) (summary order).

The Court has already given plaintiff leave to amend twice. Plaintiff could only cure the defects in his complaint if his diagnosis and treatment were entirely different than he has alleged, or he omitted from the SAC other documented complaints to existing defendants or entirely new defendants. This is highly unlikely as on June 28, 2017, plaintiff was provided a 13-page Excel spreadsheet listing the name and shift of every medical staff member at the Jail from December 2, 2015, to December 2, 2016. (Doc. #40). Accordingly, the Court finds leave to amend would be futile, and denies plaintiff leave to amend the SAC.

## CONCLUSION

The March 1, 2018, Contractor Defendants' motion to dismiss on behalf of Handler and Piacente is GRANTED IN PART and DENIED IN PART. (Doc. #83).

The March 1, 2018, County Defendants' motion to dismiss on behalf of Falco, Anderson, Skariah, Schiavone, Bajwa, Lissama Thomas, Lovelin, Nayaudupalli, Shaji, Petranker, Pillai, Jacob, and Jessy Thomas is GRANTED IN PART and DENIED IN PART. (Doc. #85).

The April 16, 2018, County Defendant Philip's motion to dimiss is GRANTED. (Doc. #134).

The April 20, 2018, Contractor Defendant George's motion to dismiss is GRANTED. (Doc. #139).

The July 17, 2018, County Defendants' motion to dismiss on behalf of Daniel, Germain, Mahabir, Stephen, Sokolohorsky, Ninan, Richards, Anim, Poulouse, Wilda-Stinfort, Zachariah, and Shinder is GRANTED IN PART and DENIED IN PART.  (Doc. #175).

The only remaining claim is the claim for deliberate indifference to plaintiff's serious medical need (i.e., his hearing loss) against defendants Dr. Zachariah, Dr. Shinder, Nurse Administrator Petranker, and N.P. Handler.  These defendants shall file answers by December 26, 2018.

The Clerk is directed to terminate the pending motions (Docs. ##83, 85, 134, 139 and 175).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

Dated: December 10, 2018
       White Plains, NY

                    SO ORDERED:

                    Vincent L. Briccetti
                    United States District Judge